## WILLIAM BIASETTI *v.* CITY OF STAMFORD ET AL. (SC 16057)

Callahan, C. J., and Borden, Berdon, Norcott, Katz, Palmer and McDonald, Js.[1]

Argued May 27—officially released August 3, 1999

---

Gary J. Wilson, for the appellant (plaintiff).

James D. Moran, Jr., with whom was James L. Sullivan, for the appellees (defendants).

*Opinion*

KATZ, J. This appeal requires the court to decide whether, under the facts of this case, post-traumatic stress disorder, a mental impairment, is an occupational disease pursuant to General Statutes § 31-275 (15)[2] and is compensable pursuant to § 31-275 (16) (B) (ii)[3] of

[2] General Statutes § 31-275 (15) provides: " 'Occupational disease' includes any disease peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such, and includes any disease due to or attributable to exposure or contact with any radioactive material by an employee in the course of his employment."

We note that since 1994, the time of the underlying occurrences in this case, changes have been made to various subdivisions of § 31-275, including subdivision (16). See footnote 3 of this opinion. Those changes, however, are not relevant to this appeal and references herein are to the current revision.

[3] General Statutes § 31-275 (16) provides: "(A) 'Personal injury' or 'injury' includes, in addition to accidental injury which may be definitely located as to the time when and the place where the accident occurred, an injury to an employee which is causally connected with his employment and is the direct result of repetitive trauma or repetitive acts incident to such employment, and occupational disease."

"(B) 'Personal injury' or 'injury' shall not be construed to include:

"(i) An injury to an employee which results from his voluntary participation in any activity the major purpose of which is social or recreational, including, but not limited to, athletic events, parties and picnics, whether or not the employer pays some or all of the cost of such activity;

"(ii) A mental or emotional impairment, unless such impairment arises from a physical injury or occupational disease;

"(iii) A mental or emotional impairment which results from a personnel action, including, but not limited to, a transfer, promotion, demotion or termination; or

"(iv) Notwithstanding the provisions of clause (i) of this subparagraph, 'personal injury' or 'injury' includes injuries to employees of local or regional boards of education resulting from participation in a school-sponsored activity but does not include any injury incurred while going to or from such activity. As used in this clause, 'school-sponsored activity' means any activity

the Workers' Compensation Act (act).[4] Although we conclude that the disorder is an occupational disease pursuant to § 31-275 (15), we nevertheless determine that it is not compensable because it fails to satisfy § 31-275 (16) (B) (ii).

The record reveals the following pertinent facts. On January 7, 1997, the parties entered into a stipulation of facts, which they submitted to the workers' compensation commissioner (commissioner) for consideration of the following issue: whether the plaintiff's injury and treatment of post-traumatic stress disorder combat fatigue syndrome (PTSD/CFS) is compensable. Thereafter, the commissioner adopted these facts and issued the following decision.

"FINDING OF DISMISSAL

"On January 9, 1997 the [defendants[5]] forwarded to the Seventh District office of the Workers' Compensation Commission a Stipulation of Facts signed by both parties, and based upon the same, the following facts are found:

"1. On or about June 8, 1994, a contract of employment existed between the [plaintiff], William Biasetti, and the [defendant], City of Stamford.

"2. The [plaintiff] has a temporary total disability rate of $638.00 and a permanent partial disability rate of $529.00 as a police officer.

"3. The [plaintiff] is married with no eligible dependents and has a date of birth of December 4, 1958.

sponsored, recognized or authorized by a board of education and includes activities conducted on or off school property and 'participation' means acting as a chaperone, advisor, supervisor or instructor at the request of an administrator with supervisory authority over the employee."

[4] General Statutes § 31-275 et seq.

[5] The defendants in this case are the city of Stamford and its insurer, Kemper Risk Management Services. References herein to the defendant, however, are to the city of Stamford only.

"4. On June 8, 1994, the [plaintiff], while working for the [defendant] in his capacity as a police officer, was involved in a high-speed pursuit. The pursuit came to an end in the Town of Fairfield, Connecticut, and a gun battle pursued.

"5. As a result of this pursuit on June 8, 1994, the [plaintiff] was instructed by his supervisor to go to Stamford Hospital for medical treatment with regard to the injuries suffered due to the gun battle.

"6. As a direct result of the gun battle, the [plaintiff] suffered from headaches, upset stomach, a pressure sensation in his right calf and upper leg, and [PTSD/CFS].

"7. The [plaintiff] came under the care of Dr. H. Martin Fuchs of Norwalk, Connecticut, and is still being treated by Dr. Fuchs for the headaches and stomach cramps.

"8. The [plaintiff] was referred to Dr. Steven A. Garrett of Norwalk, Connecticut, with regard to the pressure sensation of his right calf and upper leg.

"9. The [plaintiff] was referred to Dr. Patricia Otis Cook, a psychologist in Darien, Connecticut. The [plaintiff] saw Dr. Cook until about August 15, 1996.

"10. Dr. Cook referred the [plaintiff] to Dr. Joel Albert, a psychiatrist in Weston, Connecticut. The [plaintiff] is still [being treated] and under the care of Dr. Albert.

"11. All medical and hospital and incidental expenses relating to the treatment of the [plaintiff's] disability and injuries have been paid by the [defendant].

"12. The [plaintiff] claims that the injury and treatment of [PTSD/CFS] is an occupational disease as defined by [General Statutes §] 31-275 (15). [PTSD/CFS] is a disease peculiar to the occupation of a police officer, in which the [plaintiff] was engaged and due to causes in excess of the ordinary hazards of employment as such.

"13. On March 7, 1996, the [plaintiff] claimant was operating the [defendant's] vehicle in transporting a prisoner to Stamford police department headquarters. While in the vehicle, the [plaintiff] became dizzy and lightheaded, stopped the vehicle and blacked out.

"14. On March 7, 1996, as a result of the blackout, the [plaintiff] was sent by his supervisor to Stamford Hospital as to his injury.

"15. The [plaintiff] came under the care of Dr. Robert LaBarre, a cardiologist in Stamford, Connecticut, and treated with Dr. LaBarre.

"16. The injury of March 7, 1996, is considered a manifestation of the June 8, 1994 [PTSD/CFS], for which the [plaintiff] is still under the care of Dr. Joel Albert.

"17. It is undisputed that all physical complaints suffered by the [plaintiff] are symptoms of his [PTSD].

"18. The [defendants] contend that the [plaintiff's] [PTSD] is non compensable pursuant to [General Statutes §] 31-275 (16) (B) (ii).[6]

"Based upon the foregoing stipulated facts, I Find, Order and Decree that . . . the [plaintiff's] . . .

---

[6] In connection with stipulation number twelve, the parties disagree as to whether there was in fact a stipulation that PTSD was an occupational disease under § 31-275 (15). The plaintiff claims that the parties stipulated that PTSD/CFS is an occupational disease. The defendant, however, asserts that it stipulated only to the fact that the plaintiff had *claimed* that PTSD/CFS is an occupational disease, not that PTSD/CFS actually met the statutory definition of § 31-275 (15). The compensation review board treated stipulation number twelve as a stipulation by the parties that PTSD/CFS is an occupational disease. It further noted that the commissioner also had found that PTSD/CFS is compensable as an occupational disease under § 31-275 (15). At a subsequent point in its opinion, however, the board determined that, in order to be an occupational disease, the plaintiff's PTSD/CFS "must [have] originate[d] from a physical trauma, or some other occupational disease that was caused by a tangible physical stimulus." Because we conclude that, under the facts of this case, PTSD/CFS is an occupational disease, we treat it as such and examine whether it is compensable under § 31-275 (16) (B) (ii).

[PTSD/CFS] is not compensable under [General Statutes §] 31-275 (16) (B) (ii) and therefore this matter is DISMISSED."

Subsequently, the plaintiff filed a motion to correct the commissioner's findings, asking the commissioner to delete his conclusion that PTSD/CFS is not compensable under § 31-275 (16) (B) (ii) and insert in its place a conclusion that the plaintiff had "set forth a prima facie case that [PTSD/CFS] is an 'occupational disease' under . . . § 31-275 (15) and therefore is entitled to all benefits under the [act] . . . ."

Following the commissioner's denial of that motion, the plaintiff appealed to the workers' compensation review board (board), claiming that the commissioner's failure to make the proposed substitute finding had been improper "because such facts [had been] admitted and undisputed." He further challenged the commissioner's conclusion as being "legally inconsistent with the subordinate facts found" in that the order dismissing his claim failed to consider the "undisputed facts that the [plaintiff] incurred a mental, physical type injury . . . [and that] said injury has always been compensable and continues to be compensable under our present system."

The board, in a two to one decision, affirmed the dismissal. Thereafter, the plaintiff appealed from the decision of the board to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1, and General Statutes § 51-199 (c). We affirm the board's decision.

I

Before reaching the merits of the plaintiff's appeal, we reiterate the standards governing our review of decisions by the compensation review board. "[W]hen a decision of a commissioner is appealed to the [board],

the [board] is obligated to hear the appeal on the record of the hearing before the commissioner and not to retry the facts. *Fair* v. *People's Savings Bank*, 207 Conn. 535, 538-39, 542 A.2d 1118 (1988). The commissioner has the power and duty, as the trier of fact, to determine the facts. *Castro* v. *Viera*, 207 Conn. 420, 435, 541 A.2d 1216 (1988). The conclusions drawn by him from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. *Adzima* v. *UAC/Norden Division*, [177 Conn. 107, 118, 411 A.2d 924 (1979)]. . . . Our scope of review of the actions of the review [board] is similarly limited. *DeBarros* v. *Singleton*, 21 Conn. App. 107, 110, 572 A.2d 69 [cert. denied, 215 Conn. 808, 576 A.2d 538 (1990)]." (Citations omitted; internal quotation marks omitted.) *Vanzant* v. *Hall*, 219 Conn. 674, 677, 594 A.2d 967 (1991). "Where, however, the appeal involves an issue of statutory construction that has not yet been subjected to judicial scrutiny, this court has plenary power to review the administrative decision. See *Davis* v. *Norwich*, 232 Conn. 311, 317, 654 A.2d 1221 (1995) (state agency not entitled to special deference when its construction of statute has not undergone previous judicial scrutiny)." *Doe* v. *Stamford*, 241 Conn. 692, 697, 699 A.2d 52 (1997).

## II

The first issue we address is whether the plaintiff suffered from an occupational disease. The term "occupational disease" is specifically defined as including "any disease peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such . . . ." General Statutes § 31-275 (15). Although we recognize the public policy implications of this case, the first issue presented is, at bottom, a matter of statutory

construction. We decide this issue mindful both of general principles of statutory construction and of principles specifically applicable to workers' compensation law. As a general matter, "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature." *State* v. *Metz*, 230 Conn. 400, 409, 645 A.2d 965 (1994). We discern that intent by looking to the statutory language, to legislative history and policy and to other legislation and common-law principles. See id., 409.

In *Glodenis* v. *American Brass Co.*, 118 Conn. 29, 40, 170 A. 146 (1934), this court analyzed the statutory language requiring an occupational disease to be " 'peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such' " and concluded that to be within the definition, the disease need not "be one which arises solely out of the particular kind of employment in which the employee is engaged, nor that it . . . be due to causes in excess of the ordinary hazards of that particular kind of employment. Otherwise the definition would exclude most diseases . . . . The phrase 'peculiar to the occupation' is not here used in the sense that the disease must be one which originates exclusively from the particular kind of employment in which the employee is engaged, but rather in the sense that the conditions of that employment must result in a hazard which distinguishes it in character from the general run of occupations; see Oxford Dictionary; Funk & Wagnalls Dictionary; and the phrase 'employment as such' means employment in general."

More recently, we reiterated that, in interpreting the phrase "occupational disease," " 'the requirement that the disease be "peculiar to the occupation" and "in excess of the ordinary hazards of employment," refers to those diseases in which there is a causal connection between the duties of the employment and the disease

contracted by the employee. In other words, [the disease] need not be unique to the occupation of the employee or to the work place; it need merely be "so distinctively associated with the employee's occupation that there is a direct causal connection between the duties of the employment and the disease contracted." ' *Hansen* v. *Gordon*, 221 Conn. 29, 35, 602 A.2d 560 (1992)." *Crochiere* v. *Board of Education*, 227 Conn. 333, 352, 630 A.2d 1027 (1993).

In the present case, the workplace circumstances that caused the plaintiff's PTSD/CFS reasonably can be said to be "peculiar to" his occupation as a police officer. A "gun battle," the incident to which the parties stipulated, is not a common occurrence in most of the working world. Indeed, the plaintiff's PTSD/CFS is "distinctively associated with" his particular occupation as a police officer. See id. Thus, it can be said that the plaintiff's PTSD/CFS was an occupational disease because his job and experiences as a police officer were more likely to cause this stress disorder "than would other kinds of employment carried on under the same conditions." *Madeo* v. *I. Dibner & Bro., Inc.*, 121 Conn. 664, 667, 186 A. 616 (1936); see *Discuillo* v. *Stone & Webster*, 242 Conn. 570, 579, 698 A.2d 873 (1997) (painter cannot claim heart attack as occupational injury because both mental and physical stresses of painting were no more likely to cause heart attack than other kinds of employment under same circumstances); *Crochiere* v. *Board of Education*, supra, 227 Conn. 353 (music teacher could not claim mental injury as occupational disease where injury based upon false charges of sexual misconduct by student, because such allegations "could arise in numerous occupational settings"); *Hansen* v. *Gordon*, supra, 221 Conn. 37 (hepatitis was occupational disease where dental hygienist was "at a particular risk of contracting [hepatitis] because of [her] contact with blood and other secretions"). Therefore,

because the plaintiff's PTSD/CFS, which was caused by a gun battle, "occupied a definite relationship to the [plaintiff's] occupation," we conclude that it was an occupational disease.[7]

## III

The next issue to be decided is whether the plaintiff's PTSD/CFS was compensable. We decide this issue, again, mindful both of general principles of statutory

[7] The board concluded that PTSD/CFS cannot be an occupational disease based upon its determination that, under § 31-275 (16) (B) (ii), which excludes mental or emotional impairments from the definition of personal injury unless they are caused by physical injuries or occupational diseases, in order to be an occupational disease, the plaintiff's PTSD/CFS must have originated from a physical trauma, or have been caused by a tangible physical stimulus. Essentially, the board interpreted subdivision (16) and then grafted onto subdivision (15) its interpretation of the term "occupational disease" under subdivision (16). We disagree with the board's conclusion and its reasoning.

The defendant acknowledges that mental impairment may be an occupational disease, but argues, nonetheless, that it is not a personal injury under § 31-275 (16) (B) (ii). Therefore, according to the defendant, whether the plaintiff's PTSD/CFS can be categorized properly as an occupational disease is immaterial.

Although the legislature enacted No. 93-228, § 1, of the 1993 Public Acts (now codified at § 31-275 [16] [B] [ii]), it did not amend § 31-275 (15). In appeals arising under workers' compensation law, we must resolve statutory ambiguities or lacunae in a manner that will further the remedial purpose of the act. See *Hansen* v. *Gordon*, supra, 221 Conn. 32. Although we recognize that, in enacting workers' compensation law, the legislature did not intend to create "a general health and benefit insurance program"; id.; we do not read the act to include limitations on eligibility for compensation for which there is no statutory basis. *Doe* v. *Stamford*, supra, 241 Conn. 698. Although the legislature amended § 31-275 in other ways, it left intact the court's construction of the definition of occupational diseases. Therefore, in the absence of any limitations expressly placed upon § 31-275 (15), we hesitate to diminish its purview. See *Connecticut Light & Power Co.* v. *Public Utilities Control Authority*, 176 Conn. 191, 198, 405 A.2d 638 (1978) ("inference of legislative concurrence with the [court's] interpretation [is] to be drawn from legislative silence concerning that interpretation"). Finally, we note that if PTSD/CFS were not considered to be an occupational disease, a heart attack arising from the mental impairment would not be compensable. Clearly, that was not a result intended by the legislature.

construction and of principles specifically applicable to workers' compensation law.

The defendant claims that, in the absence of a physical injury, the plaintiff's PTSD/CFS was not compensable based upon § 31-275 (16) (B) (ii), which excludes "mental or emotional impairment, unless such impairment arises from a physical injury or occupational disease." The plaintiff asserted that his claim is not a "mental-mental" claim—that is, a mental disease giving rise to a mental impairment—but rather is a "mental-physical" claim—a claim that has a mental stimulus that causes a physical injury. In affirming the commissioner's decision, the board agreed with the defendant that the plaintiff had failed to establish a physical injury.

Additionally, the board concluded that, in amending § 31-275 (16) (B) (ii) to eliminate from the definition of personal injury "a mental or emotional impairment, unless such impairment arises from a physical injury or occupational disease"; Public Acts 1993, No. 93-228, § 1; the clear intent of the legislature was to eliminate any occupational disease that does not have a physical component. Specifically, the board stated that "[i]n order to constitute an occupational disease, the [plaintiff's PTSD/CFS] must [have] originate[d] from a physical trauma, or some other occupational disease that was caused by a tangible physical stimulus."

In *Crochiere* v. *Board of Education*, supra, 227 Conn. 333, the defendant had challenged the commissioner's conclusion that a mental injury unaccompanied by a physical component was compensable under General Statutes (Rev. to 1989) § 31-294, and argued, instead, that the physical component is essential. We disagreed. First, we turned to § 31-275, which used the term "injury" without limitation. Id., 359. Next, finding no cases that had interpreted the statute to include the proposed limitation, we determined that the court had

never hypothesized that mental injury alone could not be the subject of compensation provided that it is causally connected to the employee's work. Id. We then consulted decisions by the compensation review division, the agency entrusted with interpreting and enforcing the act, which held to the contrary. Id., citing *Henderson* v. *Brink's, Inc.*, 5 Conn. Workers' Comp. Rev. Op. 115 (1988); *Zipoli* v. *Watertown*, 3 Conn. Workers' Comp. Rev. Op. 23 (1986).

In *Crochiere*, we then stated: "The injuries compensated by the act are not only those for which an action lay under the common law, but all injuries arising out of and in the course of the employment of the injured. *Miller* v. *American Steel & Wire Co.*, 90 Conn. 349, 375, 97 A. 345 (1916). Injury, as stated throughout the act is not defined exclusively as physical injury. Neither are the words incapacity or disability when used in the statute confined exclusively to somatic conditions. *Henderson* v. *Brink's, Inc.*, supra, [5 Conn. Workers' Comp. Rev. Op.] 116. The absence of such limiting language in the rest of the statute, in contrast to the inclusion of such limiting language in General Statutes (Rev. to 1989) § 31-349, precluding liability under that section from being transferred if the previous impairment is mental or emotional, reflects the legislative intent. [I]n reliance on the classic inclusio unius [est] exclusio alterius argument, (we conclude) that had the legislature wished to restrict compensable incapacity only to those occasions when some physical element was involved, it would have included in other chapter 568 sections similar restrictive language to that used in § 31-349. Id." (Internal quotation marks omitted.) *Crochiere* v. *Board of Education*, supra, 227 Conn. 359–60.

Additionally, we looked to Professor Arthur Larson, who, in his treatise, "discusses three categories of cases

that address the various mental, nervous and stress conditions for which workers' compensation claims are routinely made: mental stimulus causing physical injury; physical trauma causing nervous injury; and mental stimulus causing nervous injury [mental-mental cases]. 1B A. Larson, The Law of Workmens' Compensation (1992) § 42.20, p. 7-813." *Crochiere* v. *Board of Education*, supra, 227 Conn. 360. Having found compensability in the first two groups; see *McDonough* v. *Connecticut Bank & Trust Co.*, 204 Conn. 104, 527 A.2d 664 (1987); *Sgritta* v. *Hertz Construction Co.*, 124 Conn. 6, 197 A. 754 (1938); we turned to the growing majority position among other jurisdictions supporting compensability in Larson's third category. We noted that, "in fact, only eight states have expressly ruled out liability in any kind of mental-mental case. 1B A. Larson, supra, § 42.25 (d), p. 7-963." *Crochiere* v. *Board of Education*, supra, 362. Based upon then recent developments in tort law reflecting a broadening of the definition of a compensable injury to include emotional distress; *Montinieri* v. *Southern New England Telephone Co.*, 175 Conn. 337, 344, 398 A.2d 1180 (1978); and a refusal "to subject a claim of mental suffering . . . to stricter scrutiny or greater care than a claim of physical suffering evidenced by the same type of complaints"; *Buckley* v. *Lovallo*, 2 Conn. App. 579, 589, 481 A.2d 1286 (1984); we held "that mental disorders, even if not accompanied by physical trauma to the body, constitute an injury under the act." *Crochiere* v. *Board of Education*, supra, 363.

While our decision in *Crochiere* was pending, the legislature, as part of a major revision of the act, enacted No. 93-228, § 1, of the 1993 Public Acts, now codified at § 31-275 (16) (B) (ii), which provides in pertinent part: "(B) 'Personal injury' or 'injury' shall not be construed to include . . . (ii) A mental or emotional impairment, unless such impairment arises from a physical injury

or occupational disease . . . ." In reliance on certain comments contained in the legislative history,[8] the board in the present case interpreted this legislative action to forbid the "mental-mental" claims included by *Crochiere*. The one dissenting member of the board disagreed, focusing on the remedial nature of the act as well as on the language in the Public Act "*or occupational disease*" (mental or emotional impairment is not a personal injury, "unless such impairment arises from a physical injury *or occupational disease*"). (Emphasis in original.) "Rather than defining 'occupational disease' in terms of the absence of a mental impairment claim, the [a]ct does the opposite: it permits a mental impairment to be recognized as a personal injury if the impairment arises from an occupational disease. We

[8] In support of its interpretation of § 31-275 (16) (B) (ii), the board referred to the legislative history of Public Act 93-228. Specifically, the board noted the following: "[Representative Michael P.] Lawlor stated in his comments that '[t]he only injury that would not be compensable that is purely a mental injury is that which was not caused by any type of a physical injury in the first place,' as opposed to a case in which an employee is physically or sexually assaulted, and subsequently incurs a mental injury. 36 H.R. Proc., Pt. 18, 1993 Sess., p. 6215. [Representative Nancy A.] DeMarinis, who opposed the version of the bill that was passed, expressed concern that the language in the proposed statute would prevent people from being compensated for trauma or extreme stress caused by the witnessing of events such as the building collapse at L'Ambiance Plaza in Bridgeport or the bombing of the World Trade Center in New York. Id., 6308. [Representative Alan] Kyle explained his support of the bill by stating that he had personally pursued a dangerous avocation at which he had seen friends killed, but he continued pursuing the avocation nonetheless. '[I]t is a very subjective thing when we speak of and interject into our laws things as ill-defined . . . as is emotional stress. . . . If a person is physically injured and cannot work, then by all means they do deserve help, but for an emotional or stressful type things, there is stress in life and we need to accept that.' Id., 6312. Comments such as these indicate that the legislature believed that the language of § 31-275 (16) (B) (ii) would not permit claims such as the one currently before us. We are not inclined to weaken the effect of the statute and the legislature's judgment by manufacturing ways to define 'mental-mental' claims as either occupational diseases or 'mental-physical' claims."

should not take it upon ourselves to adopt a more exclusionary definition in light of the humanitarian purpose of the [a]ct . . . ." Citing to *Doe* v. *Stamford*, supra, 241 Conn. 698–700 (accidental exposure to contagious disease, though it had not been contracted by claimant, constitutes an injury, even in absence of puncture or other outward sign) for its discussion of the breadth of the definition of physical injury, the dissent rejected the limitations imposed by the majority.

We need not determine, however, whether § 31-275 (16) (B) (ii) eliminated a "mental-mental" claim in order to decide the present case. Even if we were to assume, without deciding, that the legislature did *not* intend to eliminate "mental-mental" cases,[9] a review of the plain language of the statute as applied to the facts of this case is dispositive of the plaintiff's claim.

Section 31-275 (16) (B) (ii) includes within the definition of "personal injury" an emotional impairment that *arises from* or is caused by a physical injury or occupational disease. It does not, however, extend coverage to an emotional impairment *which itself is* an occupational disease. To conclude otherwise would be to ignore the causation requirement encompassed within the term "arises."

The physical symptomology of which the plaintiff complains is associated with PTSD. Indeed, the parties stipulated that the plaintiff's physical complaints constitute symptoms of his mental impairment. Although a mental impairment may give rise to a distinct and separate "personal injury," such as a heart attack or stroke

---

[9] In our review of the legislative history of Public Act 93-228, § 1, we note that whenever the question of mental impairment arises, the discussion appertains *solely* to the exception allowing for mental or emotional impairment arising from a physical injury. There is no discussion of mental impairment arising from an occupational disease, despite its inclusion in the statute. Nor is there any reference to *Crochiere*, which, although undecided, had been argued to this court.

precipitated by mental stressors, the plaintiff in the present case seeks to extend coverage to mental ailments that produce concomitant physical symptoms. Essentially, the plaintiff seeks this court to extend coverage to an emotional impairment which is *itself* an occupational disease, thereby ignoring the causation requirement of the term "arises." We agree with the defendant that the legislature intended not to extend coverage to an emotional impairment that *is itself* an occupational disease.

Virtually all psychiatric pathologies have attendant somatic symptoms. For example, five of the diagnostic criteria for major depression are physical symptoms including significant weight loss, insomnia, psychomotor agitation, fatigue and diminished ability to think or concentrate. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th Ed. 1994) p. 327 (Diagnostic and Statistical Manual). Similarly, the diagnostic criteria for, or "symptoms" of, a panic disorder include the presence of panic attacks that are marked by heart palpitations, sweating, trembling or shaking, feelings of choking, chest pain or discomfort, nausea or abdominal stress, dizziness, lightheadedness, paresthesia and chills or hot flashes. Id., 394–95, 402.

Indeed, in the present case, the blackout, which is the "injury" of March 7, 1996, according to the parties' stipulation, "is considered a manifestation of the June 8, 1994 [PTSD/CFS], for which the claimant is still under the care of Dr. Joel Albert." Moreover, as stipulated, "[i]t is undisputed that all physical complaints suffered by the [plaintiff] are symptoms of his [PTSD]." Furthermore, in a letter introduced as an exhibit, Albert, the plaintiff's treating psychiatrist, treats both the plaintiff's

"PTSD and its medical sequelae" as occupational diseases.[10]

"[S]tatutes should be construed so that no part of a legislative enactment is to be treated as insignificant and unnecessary, and there is a presumption of purpose behind every sentence, clause or phrase in a legislative enactment. *84 Century Limited Partnership* v. *Board of Tax Review*, 207 Conn. 250, 263, 541 A.2d 478 (1988), quoting *State ex rel. Kennedy* v. *Frauwirth*, 167 Conn. 165, 168, 355 A.2d 39 (1974). Courts must presume that the General Assembly did not intend to enact useless legislation. *Bergner* v. *State*, 144 Conn. 282, 287, 130 A.2d 293 (1957)." (Internal quotation marks omitted.) *Union Trust Co.* v. *Heggelund*, 219 Conn. 620, 625–26, 594 A.2d 464 (1991). Because mental impairments often carry attendant physical symptoms; see Diagnostic and Statistical Manual, supra, p. 327; by specifically including the term "arise from" in § 31-275 (16) (B) (ii), the legislature must have intended something more than the causal connection generally associated with the "time, place and circumstances of the injury" inquiry required to fall within the exclusive coverage of the act.[11] See *Spatafore* v. *Yale University*, 239 Conn. 408,

---

[10] Although the plaintiff filed a motion with the board for permission to submit as additional evidence this letter from Albert, which motion the board in its opinion concluded was properly denied, the board nevertheless determined from its own review of the record that the letter "is in fact marked as page 3 of Exhibit B in the record. Thus it appears that the [plaintiff's] motion may have been unnecessary."

[11] General Statutes § 31-275 provides in relevant part that "*unless the context otherwise provides*: (1) 'Arising out of and in the course of his employment' means . . . an occupational disease of an employee originating while he has been engaged in the line of his duty in the business or affairs of the employer upon the employer's premises, or while engaged elsewhere upon the employer's business or affairs by the direction, express or implied, of the employer . . . ." (Emphasis added.) This reflects the causal connection between the injury and the employment, specifically the origin and cause of the accident; see, e.g., *Herman* v. *Sherwood Industries, Inc.*, 244 Conn. 502, 506, 710 A.2d 1338 (1998); which the defendant does not dispute. Indeed, that causal connection is repeated in § 31-275 (16) (A). Because the legislature clearly intended to limit the compensability of a

418, 684 A.2d 1155 (1996). To conclude that physical *symptoms* of mental impairments are not excluded from coverage under the act would, at best, be to radically dilute the term "arise from," if not render it entirely superfluous. Such an interpretation would effectively result in virtually all psychiatric disabilities or mental impairments being covered, *regardless* of whether the impairment arises from a physical injury or an occupational disease. We therefore reject it.[12]

The decision of the board is affirmed.

In this opinion, CALLAHAN, C. J., and BORDEN, NORCOTT and PALMER, Js., concurred.

MCDONALD, J., with whom BERDON, J., joins, dissenting. Although I agree with part II of the majority

mental impairment by enacting Public Act No. 93-228, § 1, now codified at § 31-275 (16) (B) (ii), and in recognition of the fact that mental impairments often carry attendant physical symptoms, we conclude that the legislature intended to impose an additional burden when it chose to include the qualifying language "arises from." Further evidence of this intent can be gleaned from a comparison between the statute as it was ultimately enacted and a proposed draft of the bill, Substitute House Bill No. 7172, dated May 13, 1993, which, in place of the current language of § 31-275 (16) (B) (ii), excluded the following from the definition of "personal injury": "A MENTAL OR EMOTIONAL IMPAIRMENT UNLESS A SIGNIFICANT CONTRIBUTING CAUSE OF SUCH IMPAIRMENT IS AN EVENT OR SERIES OF EVENTS ARISING OUT OF AND IN THE COURSE OF EMPLOYMENT . . . ." This language effectively mirrored, in pertinent part, the language in § 31-275 (16) (B) (i), which merely pertains to causation.

[12] In rejecting this interpretation, we also necessarily reject the plaintiff's assertion that his claim is not a "mental-mental" claim—that is, a mental disease giving rise to a mental impairment—but, rather, is a "mental-physical" claim—a claim that has a mental stimulus that causes a physical injury. The plaintiff's claim is a mental claim with attendant symptoms. As the board correctly observed: "The commissioner made no finding of a physical injury in this case, and we will not treat this claim as a 'mental-physical' claim for the purpose of review." Such a finding is like the determination by a commissioner that an injury arose out of employment, in that it is factual in nature and therefore is accorded the same deference as that given to similar conclusions of a trial judge or jury on the issue of proximate cause. See *Crochiere* v. *Board of Education,* supra, 227 Conn. 347–48.

opinion, I disagree with the majority's conclusion that the plaintiff's injuries are not compensable.

The basis for the majority's conclusion that the plaintiff's injuries are not compensable is that, because his disabling combat fatigue *is, itself*, an occupational disease, it does not *"arise from"* an occupational disease. Such a narrow reading of the definition of "personal injury"; see General Statutes § 31-275 (16); does not effectuate the remedial purposes behind the Workers' Compensation Act (act). See, e.g., *Green* v. *General Dynamics Corp.*, 245 Conn. 66, 71, 712 A.2d 938 (1998); *Herman* v. *Sherwood Industries, Inc.*, 244 Conn. 502, 511, 710 A.2d 1338 (1998). I do not believe that the term "arises from," found in § 31-275 (16) (B) (ii), bars the plaintiff's recovery, as his disability does arise from an occupational disease. I would hold that the plaintiff's injuries, which include mental anguish with physical manifestations or symptoms, are compensable because they *arise from* an occupational disease.

The majority dismisses the plaintiff's claim that his combat fatigue syndrome is compensable, concluding that the plaintiff's claim is merely a "mental claim with attendant symptoms." Footnote 12 of the majority opinion. According to the majority, the plaintiff's headaches, upset stomach, dizziness and blackout episode are not physical injuries because they are "symptoms" of combat fatigue. In footnote 7 of its opinion, the majority suggests that, if the plaintiff suffered a heart attack arising from his condition, such an injury would be compensable. The distinction between a blackout, which the majority characterizes as a physical symptom, and a heart attack, which the majority finds to be a compensable physical injury, escapes me. The majority would have us distinguish between a physical symptom—a sign or indication of a disease—and a physical disability that arises from that disease. Logically, a physical symptom must be a result of that disease, or else

it would be a symptom of some other condition. If that symptom causes a disability, which it clearly does in this case, then it should be compensable. In effect, the majority states that there can be no compensation unless the disability for which the worker seeks compensation is different than the symptoms through which the occupational disease manifests itself. The majority peels a grape[1] to deny compensation in this case.

It is clear from the legislative history of Public Acts 1993, No. 93-228, codified at General Statutes § 31-275 et seq., that the legislature did not intend to exclude disabilities such as the plaintiff's disability from compensation. In discussing the part of the proposed legislation dealing with mental or emotional impairment, Representative Christopher G. Donovan mentioned the case of a female correction officer who had been sexually assaulted at work, but who had suffered no physical injury. 36 H.R. Proc., Pt. 18, 1993 Sess., p. 6153. Representative Donovan explained: "The prisoner grabbed [the correction officer's] body—various parts, ripped her clothes and engaged in a tussle. She was able to subdue the prisoner, close the door and receive some assistance. . . . [T]here was no physical injury at the time. There was contact, but no physical injury." Id., p. 6154. The correction officer suffered emotional damage as a result of the attack, however. Id., p. 6153. The representatives agreed that, in this situation, the correction officer would receive compensation for her mental anguish related to the attack. See id., pp. 6155–56. Representative Michael P. Lawlor stated: "In my opinion, there is a physical injury there, although if she was touched and physically assaulted, I think that is an injury and she may be compensated. . . . [B]eing assaulted by a prisoner is one of the hazards that takes place inside our State's prisons and I think she is more

[1] See Mae West, in "I'm No Angel" (Paramount 1933), quoted in J. Bartlett, Familiar Quotations (14th Ed. 1968) p. 1029.

than entitled to receive workers' [compensation] benefits, she will receive 100 [percent] of her gross base pay and I think she deserves it and I hope no one ever suggests that is taken away in that kind of situation." Id.

The scenario involving the correction officer is nearly identical to the plaintiff's situation in this case. The plaintiff was assaulted in the line of duty, although he was not wounded, as he was involved in a gun battle and shots were fired at him. While the plaintiff did not suffer physical trauma from the attack, his subsequent mental condition had arisen from the incident just as the mental distress of the correction officer. If combat fatigue syndrome is an occupational disease, a disease that is peculiar to the officer's occupation and due to causes in excess of the ordinary hazards of that occupation, it seems clear that the mental and emotional disabilities that also may be symptomatic of that disease are compensable.

Commissioner Amado J. Vargas, a member of the compensation review board who dissented from the board's decision in this case, correctly stated: "Neither § 31-275 (15) . . . nor § 31-275 (16) specifically states that occupational diseases must be accompanied by physical indicia of trauma or exposure to a foreign substance. Instead, § 31-275 (16) (B) (ii) merely says that a mental or emotional impairment is not a personal injury 'unless such impairment arises from a physical injury *or occupational disease.*' . . .

"Rather than defining 'occupational disease' in terms of the absence of a mental impairment claim, the Act does the opposite: it permits a mental impairment to be recognized as a personal injury if the impairment arises from an occupational disease." *Biasetti* v. *Stamford*, No. 03632-CRB-07-97-06 (September 8, 1998) (dissenting opinion).

The majority, I regret, ignores the legitimate needs of law enforcement officers in the dangerous and necessary work of protecting the public. That work is physically dangerous and that causes emotional and psychological harms. "Police work has been identified as the most psychologically dangerous job in the world." (Internal quotation marks omitted.) W. Terry, "Police Stress: The Empirical Evidence," 9 J. Police Sci. & Admin. 61, 70 (1981).

For the foregoing reasons, I disagree that the workers' compensation law denies compensation to this officer.

Accordingly, I dissent.