ESTATE OF JOHN DOE *v.* DEPARTMENT
OF CORRECTION
(SC 16840)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and
Zarella, Js.[1]

[1] This case was first argued on September 25, 2003, before a panel of this court consisting of Chief Justice Sullivan and Justices Borden, Norcott, Vertefeuille and Zarella. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the case be considered en banc. Justices Katz and Palmer were added to the panel, and they have read the record and the briefs, and have listened to the tape recording of the original oral argument.

Argued September 25, 2003—officially released May 11, 2004

*Joel T. Faxon*, with whom were *Michael Dennison* and, on the brief, *Michael A. Stratton*, for the appellant (plaintiff).

*Lisa Guttenberg Weiss*, assistant attorney general, with whom were *William J. McCullough*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, for the appellee (defendant).

*Opinion*

NORCOTT, J. The sole issue in this appeal is whether the workers' compensation review board (board) properly affirmed the determination by the workers' compensation commissioner for the fourth district (commissioner) that the human immunodeficiency virus (HIV) is not an occupational disease[2] for certain

---

[2] General Statutes § 31-275 (15) defines " '[o]ccupational disease' " as "any disease peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such, and includes any disease due to or attributable to exposure to or contact to radioactive material by an employee in the course of his employment."

correction officers employed by the defendant, the department of correction, and, therefore, the notice of claim filed by the plaintiff, the estate of John Doe, the decedent, was not subject to the extended three year limitation period set forth in General Statutes § 31-294c[3] for occupational disease claims. We conclude that HIV is an occupational disease for correction officers who, like the decedent, are members of the defendant's correctional emergency response unit, and that, therefore, the plaintiff's notice of claim was timely filed under § 31-294c. Accordingly, we reverse the decision of the board.

The following facts and procedural history are relevant to our resolution of this appeal. The decedent was employed as a state correction officer at the Bridgeport correctional facility (facility) from 1986 until 1991. In that position, the decedent was required to maintain security and ensure the safety of the public, inmates and staff within the facility. His duties of employment also included responding to medical emergencies, altercations and other disturbances. In addition to his regular duties of employment, the decedent was also a member of the emergency response unit, a special team of correction officers that responded to major disturbances and riots. When responding to such incidents, the decedent could be exposed to blood and other bodily fluids of inmates through splash incidents and other incidents that would cause contact between HIV infected body fluids of inmates and the decedent's skin or mucous membranes.

In April, 1992, the decedent was diagnosed with HIV, and in March, 1993, he died as a result of acquired immune deficiency syndrome (AIDS). In March, 1993,

---

[3] General Statutes § 31-294c (a) provides in relevant part: "No proceedings for compensation under the provisions of this chapter shall be maintained unless a written notice of claim for compensation is given within one year from the date of the accident or within three years from the first manifestation of a symptom of the occupational disease, as the case may be . . . ."

the plaintiff filed a notice of claim with the workers' compensation commission alleging that the decedent's contraction of HIV was caused by his contact with inmates at the facility. The plaintiff's claim was filed more than one year after the decedent's last date of employment, and was, therefore, untimely under the one year limitation period set forth in § 31-294c for accidental and repetitive trauma injuries. The plaintiff claimed, however, that the claim was timely under the three year limitation period set forth in § 31-294c for occupational disease claims. The defendant disagreed, and filed a motion to dismiss the plaintiff's claim for lack of jurisdiction.

The commissioner bifurcated the proceedings in order to focus initially on the question of whether the plaintiff met the jurisdictional requirements of § 31-294c. After several hearings, the commissioner found that HIV was not an occupational disease for correction officers and, therefore, the three year limitation period for occupational diseases set forth in § 31-294c was inapplicable.[4] The commissioner denied the plaintiff's subsequent motion to correct the factual findings. The plaintiff appealed from the commissioner's decision to the board, which affirmed that decision. Subsequently, the plaintiff appealed from the judgment of the board to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. This appeal followed.

The plaintiff contends that the board improperly affirmed the commissioner's determination that HIV does not constitute an occupational disease for correction officers. Specifically, the plaintiff claims that HIV

[4] Because the commissioner found that the plaintiff had not met the jurisdictional provisions of § 31-294c, he was without jurisdiction to hear the plaintiff's claim, and the question of whether the decedent's contraction of HIV arose out of and in the course of his employment was never addressed. Accordingly, that issue is not before us in this appeal.

is an occupational disease for correction officers under General Statutes § 31-275 (15) because it is both peculiar to the occupation and is due to causes in excess of the ordinary hazards of employment as such. The defendant contends, to the contrary, that the board's decision was proper because the plaintiff failed to prove a causal connection between the duties of a correction officer and the contraction of HIV. We agree with the plaintiff, and we conclude that HIV is an occupational disease for correction officers who, like the decedent, are members of the emergency response unit.[5]

As a threshold matter, we set forth the standard of review applicable to workers' compensation appeals. Filing "a notice of claim or . . . satisfaction of one of the . . . exceptions [contained in § 31-294c (c)] is a prerequisite that conditions whether the commission[er] has subject matter jurisdiction under the [Workers' Compensation] [A]ct." (Internal quotation marks omitted.) *Kuehl* v. *Z-Loda Systems Engineering, Inc.*, 265 Conn. 525, 534, 829 A.2d 818 (2003); *Figueroa* v. *C & S Ball Bearing*, 237 Conn. 1, 5–6, 675 A.2d 845 (1996). "[B]ecause [a] determination regarding . . . subject matter jurisdiction is a question of law, our review is plenary." (Internal quotation marks omitted.) *Lawrence Brunoli, Inc.* v. *Branford*, 247 Conn. 407, 410, 722 A.2d 271 (1999); *Anastasio* v. *Mail Contractors of America, Inc.*, 69 Conn. App. 385, 392, 794 A.2d 1061, cert. denied, 261 Conn. 914, 915, 806 A.2d 1053 (2002).

Section 31-275 (15) defines occupational disease as "any disease peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such, and includes any disease due to or attributable to exposure to or contact with any radioactive material by an

---

[5] We need not, and do not, decide whether HIV is an occupational disease for correction officers who are not members of the emergency response unit.

employee in the course of his employment." "In interpreting the phrase occupational disease, we have stated that the requirement that the disease be peculiar to the occupation and in excess of the ordinary hazards of employment, refers to those diseases in which there is a causal connection between the duties of the employment and the disease contracted by the employee. In other words, [the disease] need not be unique to the occupation of the employee or to the work place; it need merely be so distinctively associated with the employee's occupation that there is a direct causal connection between the duties of the employment and the disease contracted." (Internal quotation marks omitted.) *Malchik* v. *Division of Criminal Justice*, 266 Conn. 728, 734, 835 A.2d 940 (2003); *Biasetti* v. *Stamford*, 250 Conn. 65, 72–73, 735 A.2d 321 (1999); *Discuillo* v. *Stone & Webster*, 242 Conn. 570, 578–79, 698 A.2d 873 (1997); *Crochiere* v. *Board of Education*, 227 Conn. 333, 352, 630 A.2d 1027 (1993); *Hansen* v. *Gordon*, 221 Conn. 29, 35, 602 A.2d 560 (1992). "Thus, an occupational disease does not include a disease which results from the peculiar conditions surrounding the employment of the claimant in a kind of work which would not from its nature be more likely to cause it than would other kinds of employment carried on under the same conditions. *Madeo* v. *I. Dibner & Bro., Inc.*, 121 Conn. 664, 667, 186 A. 616 (1936)." (Internal quotation marks omitted.) *Crochiere* v. *Board of Education*, supra, 352–53.

In the present case, we agree with the plaintiff that HIV is "peculiar to" and "so distinctively associated with the [correction officers'] occupation that there is a direct causal connection between the duties of the employment and the disease contracted." (Internal quotation marks omitted.) *Hansen* v. *Gordon*, supra, 221 Conn. 35.[6] The following additional facts are relevant

---

[6] The dissent claims that this conclusion was reached by improperly relying "on *Hansen* and its progeny" and by "collaps[ing] what has been a two part

to our resolution of this claim. Edward Blanchette, the clinical director for the defendant, testified that the HIV infection rate among incarcerated individuals is 1 in 20, while the rate among nonincarcerated individuals is 1 in 1500. He also testified that correction officers were not advised which particular prisoners were infected with HIV. Instead, the officers were advised to treat all inmates as potentially infected and to take appropriate precautions. In 1989, the defendant issued administrative directive 8:11, which established procedures for mandatory training, education, prevention and tracking of possible exposure to HIV. Administrative directive 8:11 established procedures for providing correction officers with training and safety equipment that included protective rubber gloves and one-way respirators for performing cardiopulmonary resuscitation. In 1991, the Occupational Safety and Health Administration issued a directive that made recommendations of occupational safety and health considerations for exposure to blood-borne pathogens.

John Shanley, the director of the division of infectious diseases at the University of Connecticut Health Center, and the chair of infectious diseases and HIV for the state of Connecticut, also testified before the commissioner. Shanley testified that exposure to HIV is normally through close physical contact with blood products, semen, cervical secretions and breast milk. He further testified that in order for HIV to be transmitted from an infected individual to a noninfected individual through blood, there must be a direct transfer of blood either

analysis into a single inquiry . . . ." We disagree with this assertion. As the numerous cases previously cited demonstrate, this court has had several opportunities to apply and reaffirm the very same language and law that is relied upon in this opinion, most recently in a unanimous opinion of this court in *Malchik* v. *Division of Criminal Justice*, supra, 266 Conn. 734–36; see also *Biasetti* v. *Stamford*, supra, 250 Conn. 72–73; *Discuillo* v. *Stone & Webster*, supra, 242 Conn. 578–79; *Crochiere* v. *Board of Education*, supra, 227 Conn. 352.

across the skin or across a mucous membrane. Blanchette testified that the principal methods of transmitting HIV to another are through sexual contact, blood transfusions, intravenous drug use, and transmission from mother to child. In addition, Shanley testified that the statistical HIV infection rate for splash incidents involving HIV infected blood is 0.09 percent, while the infection rate for needle stick injuries is 0.3 percent. A splash incident occurs when the blood of an infected person comes into contact with the skin or mucus membranes of a noninfected individual, such as when a correction officer comes into contact with an infected inmate's blood while breaking up a fight. As demonstrated by the statistics testified to by Shanley, a splash incident is not as effective a means of transmission of HIV as sexual intercourse or direct injection of HIV through a needle or other sharp instrumentality. On the basis of this testimony, the commissioner found that "merely being in the presence of an HIV positive person does not expose one to the hazards of the disease, it requires a particular event to potentially contract the virus."

As concerns occupational infection rates, Blanchette testified that he was not aware of any other correction officers who had contracted HIV through work-related exposure. He further testified that he was only aware of one confirmed case of an employee of the defendant contracting HIV through workplace exposure, and that involved a health care provider who was struck with an infected syringe during the course of her employment. Shanley testified that there are fifty-five nationwide confirmed cases of occupationally transferred HIV, and 136 probable cases, documented by the National Center for Disease Control. These cases almost entirely consist of health care and research professionals.[7] Shanley testi-

---

[7] Both Shanley and Blanchette testified that the occupations in which people are at increased risk of being infected with HIV are almost exclusively in the health care and research professions.

fied that the only documented case of occupational exposure outside of those two professions involved a police officer who was stabbed with an infected needle.

In the course of his employment, the decedent experienced numerous incidents when he could have come into contact with blood or other bodily secretions from inmates through splash incidents, or through other conduct by inmates that would bring the inmates' bodily fluids into contract with the decedent's skin or mucous membranes. Because the decedent was a member of the emergency response unit, one of his specific "duties of employment" was to break up altercations, riots, and other emergencies in which, through splash or other similar incidents, he could have come into contact with the blood and bodily secretions[8] of inmates.[9] Breaking up altercations and riots in an inmate population with an HIV infection level of 1 in 20, more than seventy times greater than the infection rate of the nonincarcerated population, is "peculiar to" the decedent's occupation

A third expert, James Cohen, a vocational rehabilitation specialist, also testified before the commissioner on behalf of the plaintiff. Cohen testified that of the 12,700 job titles listed in the Directory of Occupational Titles, only 317 involved potential blood or bodily fluid exposure as a natural incident of the job. Cohen further testified that correction officers were one profession that was contained in the group of 317 job titles.

[8] According to Shanley's testimony, while blood, semen and cervical secretions are effective agents of transmission for HIV, other bodily secretions, such as sweat, saliva, urine and feces, are highly ineffective agents of transmission.

[9] In addition to testimony from the decedent on the hazards faced by correction officers through their employment duties, testimony was also given by John Tarascio, the warden of the facility, Fred Poole, a captain with the defendant, Sandra Tanguay, the operational administrator at the University of Connecticut Health Center, Correctional Managed Health Care, Sandra Zawada, a captain with the defendant, and Anndean Kmetz, a lieutenant with the defendant. These witnesses all offered testimony on, among other things, the employment duties for correction officers in defendant's facilities, including breaking up fights, exposure to blood, having feces and other bodily secretions thrown at them, and incidents with inmates wielding homemade weapons.

as a correction officer in the emergency response unit. These "duties of the employment" are not common occurrences in most of the working world, and are "so distinctively associated with the [decedent's] occupation that there is a direct causal connection between the duties of the employment and the disease contracted." (Internal quotation marks omitted.) *Hansen* v. *Gordon*, supra, 221 Conn. 35.

In affirming the commissioner's determination, the board stated that "the fact that HIV is unusually prevalent in the average [United States] prison population does not lead inexorably to the notion that a correctional officer's risk of being exposed to HIV is so high that it constitutes an occupational disease for that particular group of workers." Although this statement by the board is correct, it ignores the fact that the specific duties of employment for correction officers who are members of the emergency response unit required them not just to be in the presence of inmates with a high HIV infection rate, but to interact with them in a manner that greatly increases their risk of contracting the disease—including breaking up fights, dealing with homemade weapons, and responding to medical emergencies. Similar to the duties of the dental hygienist in *Hansen*, the duties of employment for members of the emergency response unit requires participation in employment activities that increase their risk of exposure to a blood borne disease. See also *Doe* v. *Stamford*, 241 Conn. 692, 700, 699 A.2d 52 (1997) ("For purposes of workers' compensation law, the injury suffered by the claimant is the exposure to potentially fatal contagious diseases. That injury is no less real or cognizable because it was not attended by puncture or abrasion. See *Arkansas Dept. of Correction* v. *Holybee*, 46 Ark. App. 232, 235, 878 S.W.2d 420 [1994] [in case involving correction officer bitten by HIV positive inmate, claimant's injury was not merely bite wound but also risk of infection); *Jackson*

*Township Volunteer Fire Co.* v. *Workmen's Compensation Appeal Board (Wallet)* [594 A.2d 826, 828 (Pa. Commw. 1991)] [in case involving ambulance attendant who came into contact with HIV contaminated blood, claimant's 'injury was the risk of infection'].").

Therefore, in the present case, the decedent's HIV infection constitutes an occupational disease because his employment as a correction officer in the emergency response unit was more likely to cause this disease "than would other kinds of employment carried on under the same conditions." *Madeo* v. *I Dibner & Bro., Inc.*, supra, 121 Conn. 667; *Biasetti* v. *Stamford*, supra, 250 Conn. 73. Other occupations conducted within the facility may not have the same level of risk due to different duties of employment. A janitor, for example, although working with the correction officer in the same facility, does not face the same level or risk of infection because of differing duties of employment. Although both are surrounded by inmates with a high infection rate, the janitor's duties of employment presumably do not require intimate physical contact with the inmates. The correction officer's duties of employment, however, distinctly require intimate physical contact with the inmates, often in situations where blood and other bodily fluids that transmit HIV are present. This distinction is enhanced in the present case due to the decedent's involvement with the special response unit. Furthermore, at the time the decedent was working as a correction officer, there was not extensive knowledge of HIV and its causes, nor the necessary safety precautions that the defendant employs today.

Our conclusion in the present case is guided by, and consistent with, our prior decisions on occupational diseases. Compare *Biasetti* v. *Stamford*, supra, 250 Conn. 73 (post-traumatic stress disorder was occupational disease for police officer involved in gun battle, which is peculiar to that occupation) and *Hansen* v.

*Gordon,* supra, 221 Conn. 37 (hepatitis type B virus [HBV] is occupational disease for dental hygienists because of daily exposure to blood, other bodily secretions, and sharp instruments) with *Discuillo* v. *Stone & Webster,* supra, 242 Conn. 579 (painter could not claim heart attack as occupational disease because both mental and physical stresses of painting were no more likely to cause heart attack than other kinds of employment carried out under same conditions), *Crochiere* v. *Board of Education,* supra, 227 Conn. 353 (music teacher could not claim mental injury as occupational injury based upon false charges of sexual misconduct because such allegations "could arise in numerous occupational settings") and *Madeo* v. *I. Dibner & Bro., Inc.,* supra, 121 Conn. 667 (tuberculosis was not occupational disease because seamstress occupation was not any more likely to cause disease "than would other kinds of employment carried on under the same circumstances"). Accordingly, we conclude that the commissioner improperly determined that HIV was not an occupational disease for correction officers who are members of the emergency response unit.

As Professor Larson's treatise on workers' compensation law indicates: "All states now provide general compensation coverage for occupational diseases. For the purpose of defining the affirmative inclusion of disease within this term, the older definition distinguishing occupational disease from accident has been largely abandoned, with its stress on gradualness and on prevalence of the disease in the particular industry. Jurisdictions having general coverage of occupational disease now usually define the term to include any disease arising out of exposure to harmful conditions of the employment, when those conditions are present in a peculiar or increased degree by comparison with employment generally. Thus, even a disease which is rare and which is due to the claimant's individual allergy

or weakness combining with employment conditions will usually be held to be an occupational disease if the increased exposure occasioned by employment in fact brought about the disease." 3 A. Larson & L. Larson, Workers' Compensation Law (1999) c. 52, scope, p. 52-1. The cases cited by this treatise indicate that the more inclusive definition of occupational disease that we effectively adopted in *Hansen* v. *Gorden*, supra, 221 Conn. 38, is consistent with the national trend.[10]

The defendant claims, however, that the facts found by the commissioner indicate that of all of the prior cases of occupational infection, only one involved a profession outside the fields of health care or research. In essence, the defendant argues that the lack of previous HIV infections among correction officers demonstrates that the commissioner properly found that HIV is not an occupational disease for that profession. We

---

[10] The dissent's conclusion that "the risk of HIV exposure from a splash incident is so minimal, fortunately, that it is not an increased hazard of employment" improperly focuses on the prevalence of a disease rather than the causal connection between the duties of employment and the disease. This approach is not only contrary to the national trend recognized in Professor Larson's treatise, but was rejected previously by this court in *LeLenko* v. *Wilson H. Lee Co.*, supra, 128 Conn. 505, and *Hansen* v. *Gordon*, supra, 221 Conn. 38. More specifically, in support of its conclusion the dissent cites language in *Glodenis* v. *American Brass Co.*, 118 Conn. 29, 41, 170 A. 146 (1934), stating that "[e]vidence that lead poisoning would not naturally result from that particular kind of employment and that the hazard from it in that employment was not beyond that incident to employment in general would be proper. The fact that there were no known cases of lead poisoning among casters in other factories of the defendant where the same kind of work was being carried on as in that at Waterbury would be relevant and material." In this court's subsequent opinion in *LeLenko* v. *Wilson H. Lee Co.*, supra, 505, however, this court expressly rejected a claim that a disease must be one which is "usual or generally recognized" for the occupation, and explained that "[a] careful consideration of the question now before us negatives any inference to the contrary which might be drawn from our decisions in the *Glodenis* and *Madeo* cases." See also *Hansen* v. *Gordon*, supra, 221 Conn. 36 (noting that workers' compensation review division construes statutory definition of occupational disease simply to refer to concepts of proximate causation).

rejected this argument as early as 1942 in *LeLenko* v. *Wilson H. Lee Co.*, 128 Conn. 499, 24 A.2d 253 (1942). In that case, this court concluded that "[o]ccupational diseases result ordinarily in incapacity in a relatively small proportion of the number of employees subjected to the risk; indeed if this were not so, economic considerations would require an abandonment of the employment or a change in its conditions to obviate the risk.[11] There is nothing in the terms of our statutory definition of an occupational disease which suggests that to fall within it a disease must be one which is a usual or generally recognized incident of the employment, and the considerations we have suggested preclude our finding that such a legislative intent is to be implied. . . . When we [refer] . . . to disease as being a 'natural' incident of the employment, we [use] that word in the sense that we have used it in defining proximate causation . . . it imports not a forward look to determine what risks should have been foreseen, but a tracing back from the results to the circumstances out of which the disease sprang. . . . If, so traced, a disease is the natural result of the conditions which are inherent in the employment and which attach to that employment a risk of incurring it in excess of that attending employment in general, an award of compensation is not precluded because the risk is one which has not become generally recognized or because only employees unusually susceptible will suffer from the disease." (Citations omitted.) Id., 504–505. In other words, the workers' compensation law "does not require frequent or typical

---

[11] It is noteworthy that, in 1989, the defendant promulgated administrative directive 8:11, which requires mandatory training, education, prevention and tracking of possible exposure to HIV. Specifically, administrative directive 8:11 established procedures for providing correction officers with training and procedures for providing correction officers with training and safety equipment such as protective rubber gloves and one-way respirators for administering cardiopulmonary resuscitation. Implicit in the defendant's issuance of this directive is a recognition that correction officers face a heightened risk of HIV infection.

exposure [to the disease] but only that there be a direct causal connection between the occupation and the disease. It is sufficient . . . [to] show that [the claimant's] contracting the disease, *no matter how rare*, or unusual, was occasioned by conditions characteristic of and peculiar to [the claimant's] job." (Emphasis added; internal quotation marks omitted.) *Russell* v. *Camden Community Hospital*, 359 A.2d 607, 612 (Me. 1976) (applying Maine's occupational disease statute); see also *Hansen* v. *Gordon*, supra, 221 Conn. 38 (approving of reasoning in *Russell*).

In addition, the defendant claims that concluding that HIV is an occupational disease of correction officers would turn the workers' compensation system into a general health benefit and insurance program, in direct contravention of this court's decision in *Hansen* v. *Gordon*, supra, 221 Conn. 32, as well as the intent of our legislature. We disagree.

In *Hansen*, this court stated that "the legislature did not intend to impose upon the employer liability for diseases contracted outside the work place, or to transform the Workers' Compensation Act into a general health and benefit insurance program that would compensate an employee for all contagious diseases." Id. In the present case, the commissioner bifurcated the proceedings, and addressed only the jurisdictional question posed by § 31-294c. Because the commissioner found that the plaintiff had not met the jurisdictional provisions of that section, he was without jurisdiction to hear the plaintiff's claim, and causation was never addressed. See *Discuillo* v. *Stone & Webster*, supra, 242 Conn. 577 (concluding that, for commissioner to have jurisdiction over claim, claim must fit within jurisdictional provisions of General Statutes § 31-294, which was later repealed, and its jurisdictional provisions were recodified at § 31-294c). Had the commissioner found, as a jurisdictional matter, that the decedent's

HIV was an occupational disease, the plaintiff still would have had the burden of proving compensability.

In *Kolomiets* v. *Syncor International Corp.*, 252 Conn. 261, 266, 746 A.2d 743 (2000), we reiterated "the general test for compensability under our workers' compensation system. It is an axiom of [workers'] compensation law that awards are determined by a two-part test. The [claimant] has the burden of proving that the injury claimed arose out of the employment and occurred in the course of the employment. There must be a conjunction of [these] two requirements . . . to permit compensation. . . . The former requirement relates to the origin and cause of the accident, while the latter requirement relates to the time, place and [circumstance] of the accident." (Internal quotation marks omitted.) Accordingly, a holding recognizing that HIV is an occupational disease for correction officers like the decedent here would *not* confer an automatic award of workers' compensation benefits upon the plaintiff, or upon any correction officer who has contracted HIV. Rather, on remand to the commissioner, the plaintiff still would have to establish that the decedent's HIV infection arose both "out of" and "in the course of" his employment as a correction officer in the emergency response unit. In other words, the plaintiff would have to show that the decedent's HIV infection actually was caused by his employment as a correction officer in that unit, and not another source. See *Hansen* v. *Gordon*, supra, 221 Conn. 38 (affirming award "because the claimant has proven that HBV arose out of and in the course of her employment, *and* that HBV is an occupational disease for a dental hygienist" [emphasis added]). Therefore, the defendant's claim that the result reached in the present case will turn the workers' compensation system into a general insurance program is without merit.

The decision of the board is reversed and the case is remanded to the board with direction to reverse the decision of the commissioner, and to remand the case to the commissioner for further proceedings.

In this opinion BORDEN, KATZ and PALMER, Js., concurred.

SULLIVAN, C. J., concurring. I concur in the majority's judgment that human immunodeficiency virus (HIV) "is an occupational disease for correction officers who, like the decedent, are members of the defendant's correctional emergency response unit, and that, therefore, the plaintiff's notice of claim was timely filed under § 31-294c." I write separately to express my disagreement with the majority's determination that it need not decide in this case whether HIV is an occupational disease for correction officers who are not members of the emergency response unit.

The majority agrees with the workers' compensation review board's determination that "the fact that HIV is unusually prevalent in the average [United States] prison population does not lead inexorably to the notion that a correction officer's risk of being exposed to HIV is so high that it constitutes an occupational disease for that particular group of workers." The majority concludes, however, that the board improperly ignored "the fact that the specific duties of employment for correction officers who are members of the emergency response unit [require] them not just to be in the presence of inmates with a high HIV infection rate, but to interact with them in a manner that greatly increases their risk of contracting the disease—including breaking up fights, dealing with homemade weapons, and responding to medical emergencies." Because the record shows that *all* correction officers, not only those who also serve in the emergency response unit, are

responsible for breaking up fights, dealing with home-made weapons, and responding to medical emergencies, I disagree with the majority's decision to limit its holding that HIV is an occupational disease to those correction officers who are also members of the emergency response unit.

In a deposition subsequently entered as an exhibit in the workers' compensation commission hearing, the decedent testified that he worked as a correction officer in the maximum security prison area for approximately one year[1] before he became an emergency response unit member. In this area, the decedent was responsible for, among other things, responding to disturbances. Although he became an emergency response unit member in 1987, the decedent's primary job duties as a correction officer did not change after he became a member of that unit.[2] Those duties had required and continued to require the decedent to have physical contact with inmates on a daily basis. In addition, the decedent explained that, as a correction officer, he had worked in all of the living areas in the prison, including maximum, medium, and minimum security. In each area, the decedent had been and continued to be responsible for, among other things, "stepping between people" and "physically removing [inmates who were] either assaulting an officer or another inmate . . . ."

The decedent stated that he had been exposed to inmates' blood on several occasions when he had intervened during fights. On one particular occasion in 1986,

[1] The decedent stated that he was employed as a "line officer" for his entire term of service with the department of correction. He explained that a "line officer" is a correction officer who deals "one-on-one with the . . . inmate population."

[2] The decedent explained that his duties as a correction officer were not altered, but rather supplemented, after he received his emergency response unit training. He stated that he was "a regular officer by day and, as needed . . . [an emergency response unit] member by night."

during his first year as a correction officer and before he became an emergency response unit member, the decedent was exposed to a significant amount of blood when he was one of the first officers to respond when an inmate, who was a known male prostitute, assaulted a prison shift commander. The decedent also was exposed to inmates' blood when responding to medical emergencies. In one instance, the decedent held pressure on an inmate's open wound. In addition, the decedent had received a puncture wound when his hand struck a razor blade during a cell shakedown.[3]

Further testimony before the workers' compensation commissioner (commissioner) at the hearing bolsters the decedent's claim that, as a correction officer, he was subject to a high risk of exposure to inmates' blood. Fred Poole, a captain with the department of correction, worked at the Bridgeport correctional center from 1981 through 1987. He stated that it was common for correction officers to come into contact with inmates' bodily fluids, especially blood, when they responded to fights. Not all of these officers were members of an emergency response unit.

Edward Blanchette, the clinical director for the defendant department of correction since 1990, testified that correction officers are frequently called upon to break up inmate fights, which occasionally expose the officers to blood. He estimated that, on average, he responds two or three times per week to incidents involving bodily fluids and blood contact from fights in the inmates' quarters. He stated that "blood contact where an officer is involved [in] breaking up a fight and there's blood being spilled . . . or the officer has been cut and blood is an issue" is considered a "significant

[3] The decedent stated that a "cell shakedown" consisted of "having any inmate that may be in the cell at the time removed from the cell [and] patted down for any weapons [and] illegal contraband within the jail."

exposure" warranting the administration of antiretroviral medications (ARV therapy) for prophylactic purposes.[4] He explained that studies have indicated that ARV therapy administered immediately after a very significant exposure would, if the virus had in fact entered the body, attenuate the virus' activity to such a degree that infection would not take place. He estimated that during the year 2000, three correction officers were exposed significantly enough to merit ARV therapy.[5]

The commissioner's factual findings also bolster the proposition that the decedent, while serving as a correction officer, before he joined the emergency response unit, was at high risk of exposure to inmates' blood. The commissioner determined that the decedent's "duties *as a correctional officer* required him to maintain [the] security and safety of the public, inmates, and staff and to respond to emergency codes and break up fights." (Emphasis added.) In addition, the commissioner concluded that "[c]*orrectional officers* could be exposed to blood and bodily fluids of inmates during the course of their employment." (Emphasis added.) The commissioner also concluded that, while serving as a correction officer, the decedent would "break up fights between inmates" and "could also get involved with inmates who were having medical emergencies" and that therefore he "could be exposed to their blood." Although it found that the decedent "was a member of a special team of correctional officers that responded to major disturbances and riots," the commissioner did not conclude in his factual findings that the decedent was potentially exposed to inmates' bodily fluids only while responding to incidents as an emergency

---

[4] Sandra Tanguay, a registered nurse employed by the department of correction as a nurse educator, also explained that correction officers may experience "significant exposure" to "blood-to-blood contact should they be breaking up a fight."

[5] Blanchette explained that this figure was limited to employees, including correction officers and guards, who were not in the health care field.

response unit member, but not while responding to incidents as a correction officer.

Finally, even the majority concedes that the decedent's employment duties as a correction officer required him to respond "to medical emergencies, altercations and other disturbances" and that a "correction officer's duties of employment . . . distinctly require intimate physical contact with the inmates, often in situations where blood and other bodily fluids that transmit HIV are present." The majority also concludes, and I agree, that the decedent's risk of exposure to such situations was increased by his involvement with the special response unit. The fact that the risk was increased for special response unit members does not mean, however, that the risk was not sufficiently high to constitute an occupational disease for correction officers who were not part of a special response unit.

Given the evidence presented at the workers' compensation hearing that intimate interaction with inmates is an employment responsibility for all correction officers, coupled with the commissioner's factual findings regarding that evidence, I disagree with the majority's decision to limit its holding that HIV is an occupational disease for correction officers solely to those officers who are also members of the emergency response unit. I note that the parties in this case, the workers' compensation commissioner and the workers' compensation review board, considered the issue as involving all correction officers, not only officers who are emergency response unit members. I do not believe that it is appropriate for this court to create a subclassification within the class of correction officers when no one has advocated that position and it is not compelled by the evidence.

Assume, hypothetically, that two correction officers, only one of whom is also an emergency response unit

member, contract HIV after responding to an incident and file claims beyond the one-year limitation period set forth in § 31-294c for accidental injuries. Under the majority's opinion, the correction officer who is not an emergency response unit member may be required to litigate whether his HIV infection is an occupational disease, and therefore subject to a three-year limitation period. I believe that it is wrong to leave correction officers in a state of uncertainty and to create the need for additional future litigation, with its attendant anxiety, delay, and expense, to obtain the answer to a question that already has been fully addressed in the present case.

VERTEFEUILLE, J., with whom ZARELLA, J., joins, dissenting. I respectfully disagree with the majority's conclusion that human immunodeficiency virus (HIV) constitutes an occupational disease, as defined by General Statutes § 31-275 (15), for correction officers, such as the plaintiff's decedent, employed by the defendant, the department of correction (department), as members of the department's emergency response unit. After a careful review of our prior decisions, I conclude that the majority, by focusing on causation to the exclusion of an increased risk of contraction, interprets the statutory definition too narrowly. Because the undisputed evidence before the workers' compensation commissioner for the fourth district (commissioner) was that only one department employee in Connecticut has contracted HIV through workplace exposure, and that exposure was the result of a needle stick, I must conclude that correction officers who are members of the emergency response unit are not at an increased risk of contracting HIV. Accordingly, I further conclude that HIV is not an occupational disease for these correction officers. I therefore dissent.

Section 31-275 (15) provides that an " '[o]ccupational disease' includes any disease peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such . . . ." Unlike the majority, I construe § 31-275 (15), as interpreted by our prior decisions, to require consideration of two factors. Not only must there be, as the majority acknowledges, a direct causal connection between the employment and the disease contracted, but there must also be an increased risk of incurring the disease from that employment. See *Glodenis* v. *American Brass Co.*, 118 Conn. 29, 40–41, 170 A. 146 (1934); *Madeo* v. *I. Dibner & Bro., Inc.*, 121 Conn. 664, 667, 186 A. 616 (1936); *LeLenko* v. *Wilson H. Lee Co.*, 128 Conn. 499, 505, 24 A.2d 253 (1942). In other words, the occupation must be such that an individual in that position is more likely to contract the disease than he or she would be in another occupation.

Prior to this court's decision in *Hansen* v. *Gordon*, 221 Conn. 29, 602 A.2d 560 (1992), on which the majority relies, this court has had numerous opportunities to consider the statutory language at issue in this appeal. This court first analyzed the definition of an occupational disease[1] in *Glodenis* v. *American Brass Co.*, supra, 118 Conn. 31–32, in which the plaintiff, a factory worker, claimed that the trial court improperly excluded evidence that could have established that lead poisoning constituted an occupational disease. This court stated that, "[t]o come within the [statutory] definition an occupational disease must be a disease which is a *natural incident* of a particular occupation, and

---

[1] This court's early decisions regarding the definition of an occupational disease, including *Glodenis*, *Madeo* and *LeLenko*, construed the relevant workers' compensation statute in effect at the time, i.e., General Statutes (1930 Rev.) § 5223. We note that § 5223, which defined an occupational disease as a disease "peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such" is, in pertinent part, identical to its successor, § 31-275 (15).

must *attach to that occupation a hazard* which distinguishes it from the usual run of occupations and is in excess of that attending employment in general." (Emphasis added.) Id., 40–41.

Two years later, then Chief Justice Maltbie, the author of the *Glodenis* majority opinion, again addressed the issue in *Madeo* v. *I. Dibner & Bro., Inc.*, supra, 121 Conn. 664. In that case, the plaintiff, a dressmaker, unsuccessfully sought to characterize tuberculosis as an occupational disease. Referencing the *Glodenis* court's definition, this court stated that, "[t]his definition requires that, to constitute an occupational disease, the disease must be a natural incident of a particular kind of employment, one which is *likely to result from that employment because of its inherent nature.* It does not include a disease which results from the peculiar conditions surrounding the employment of the claimant in a kind of work which would not from its nature be more likely to cause it than would other kinds of employment carried on under the same conditions." (Emphasis added.) Id., 667.

This court further explained its interpretation of the definition of an occupational disease in *LeLenko* v. *Wilson H. Lee Co.*, supra, 128 Conn. 499–500, in which a linotype operator claimed that dermatitis constituted an occupational disease. In affirming the trial court's conclusion that, as it pertained to linotype operators, dermatitis constituted an occupational disease, this court stated that, "[w]hen we referred in [*Glodenis* and *Madeo*] to disease as being a 'natural' incident of the employment, we used that word in the sense that we have used it in defining proximate causation . . . ." (Citation omitted.) Id., 505.

In *Hansen* v. *Gordon*, supra, 221 Conn. 38, this court concluded that hepatitis type B virus (hepatitis B) constituted an occupational disease as to dental hygienists.

Again citing *Glodenis*, the court stated that "the requirement that the disease be 'peculiar to the occupation' and 'in excess of the ordinary hazards of employment,' refers to those diseases in which there is a causal connection between the duties of the employment and the disease contracted by the employee." Id., 35.

Most recently, in *Biasetti* v. *Stamford*, 250 Conn. 65, 73, 735 A.2d 321 (1999), we concluded that "[a] gun battle . . . is not a common occurrence in most of the working world." (Internal quotation marks omitted.) Thus, "it can be said that the plaintiff's [post-traumatic stress disorder/combat fatigue syndrome] was an occupational disease because his job and experiences as a police officer were *more likely* to cause this stress disorder than would other kinds of employment carried on under the same conditions." (Emphasis added; internal quotation marks omitted.) Id.

This brief survey of our case law reveals that since 1936, we have consistently stated that an occupational disease must be a " 'natural' incident of the employment"; *LeLenko* v. *Wilson H. Lee Co.*, supra, 128 Conn. 505; and must create "a hazard which distinguishes it from the usual run of occupations and is in excess of that attending employment in general." (Emphasis added.) *Glodenis* v. *American Brass Co.*, supra, 118 Conn. 40–41. I construe this language as contemplating consideration of both causation *and* increased risk.[2] As we stated in *LeLenko*, the phrase " 'natural' incident" refers to causation. *LeLenko* v. *Wilson H. Lee Co.*, supra, 505. Likewise, I interpret the phrase "a hazard which distinguishes it from the usual run of occupations and is in excess of that attending employment in general"; *Glodenis* v. *American Brass Co.*, supra, 40–41; to refer

[2] Hazard is defined as "[a] *risk* or peril, assumed or involved . . . in connection with . . . employment . . . ." (Emphasis added.) Black's Law Dictionary (6th Ed. 1990). Accordingly, I use the terms "hazard" and "risk" interchangeably.

specifically to an increased risk of contraction. I reach this conclusion based upon this court's previous consideration of whether contracting a specific disease is more likely to occur as a result of the relevant occupation. See *Madeo* v. *I. Dibner & Bro., Inc.*, supra, 121 Conn. 667 ("disease must be . . . likely to result from that employment"); *Biasetti* v. *Stamford*, supra, 250 Conn. 73 ("experiences as a police officer were more likely to cause [post-traumatic stress disorder/combat fatigue syndrome] than would other kinds of employment carried on under the same conditions" [internal quotation marks omitted]).

The majority, by relying on *Hansen* and its progeny, concludes that HIV is " 'peculiar to' " and " 'so distinctly associated with the [correction officers'] occupation that there is a direct causal connection between the duties of the employment and the disease contracted.' " I believe that by focusing on our case law emphasizing causation, the majority collapses what has been a two part analysis into a single inquiry into causation and fails to explore adequately whether correction officers who are members of the emergency response unit are at an increased risk of contracting HIV.

The present case is factually distinguishable from *Hansen*, because, in *Hansen*, "*all* the expert testimony revealed that dental professionals are at *an increased risk of contracting [hepatitis B]* because of their exposure to bodily secretions on a daily basis, as well as their use of sharp instruments that can puncture their skin, thereby allowing [hepatitis B] entry into their bodies." (Emphasis added.) *Hansen* v. *Gordon*, supra, 221 Conn. 38. Given this undisputed expert testimony, the *Hansen* court did not *need* to address whether dental hygienists were more likely to contract hepatitis B due to their employment. Such is not the case here. The record reveals no expert consensus regarding a correction officer's risk of contracting HIV. Therefore, before

labeling HIV as an occupational disease, we must consider whether a correction officer's risk of contracting HIV is greater than the risk attending employment in general. See *Glodenis* v. *American Brass Co.*, supra, 118 Conn. 40–41. On the basis of the evidence adduced before the commissioner, I must conclude that it is not.

The expert testimony cited by the majority simply does not support its conclusion that "the decedent's HIV infection constitutes an occupational disease because his employment as a correction officer in the emergency response unit was more likely to cause this disease than would other kinds of employment carried on under the same conditions." (Internal quotation marks omitted.) Specifically, I believe that the majority unduly discounts the highly probative fact that the only work-related HIV infection in the correction department involved a health care provider infected by a needle stick. It is undisputed that health care providers are at an increased risk of contracting HIV due to their routine collection of blood and bodily fluids for diagnostic purposes, as well as their systematic handling of syringes, needles, and other sharp instruments that could lead to potential blood-to-blood contact. By contrast, in the course of their duties, correction officers who are part of the emergency response unit may be exposed to blood and bodily fluids via splash incidents, which occur when the blood or bodily fluid of an infected person comes into contact with the skin or mucous membrane of a noninfected individual. As the majority notes, however, the statistical HIV infection rate for splash incidents involving HIV infected blood is 0.09 percent, while the infection rate for needle stick injuries is 0.3 percent. Thus, a splash incident is substantially less likely to result in transmission of HIV than a needle stick, and emergency response correction officers are much less likely to contract HIV than health care workers. I therefore agree with the compensation review

board that the risk of HIV exposure from a splash incident is so minimal, fortunately, that it is not an increased hazard of employment.

My conclusion that, on the facts of the present case, correction officers who are members of emergency response units are not at an increased risk for HIV infection is buttressed by the facts of *Biasetti* v. *Stamford*, supra, 250 Conn. 73, in which a police officer contracted post-traumatic stress disorder/combat fatigue syndrome following a "gun battle." *Biasetti*, I believe, is illustrative of the proper factual foundation for concluding that an occupation creates an increased risk of contracting a disease. A "gun battle," in the employment context, is exclusive to those professions that utilize firearms in the regular course of their employment, namely, law enforcement officials and military personnel. In other words, the use of firearms, a necessary tool of law enforcement, makes post-traumatic stress disorder/combat fatigue syndrome more "likely to result from that employment because of its inherent nature." *Madeo* v. *I. Dibner & Bro., Inc.*, supra, 121 Conn. 667. The present case is factually distinguishable from *Biasetti* because there is nothing inherent in the duties of correction officers who serve on emergency response units that makes them more likely to contract HIV than "other kinds of employment carried on under the same conditions." Id.

Finally, I disagree with the majority's summary dismissal of relevant statistics suggesting that these correction officers are not at an increased risk, specifically, the fact that there has been only one documented case of occupational HIV infection in the department. The majority maintains that the absence of known instances of employment-related HIV cannot preclude classification as an occupational disease. I disagree that this highly probative fact can be ignored. Indeed, in *Glodenis*, this court stated that "[e]vidence that lead poi-

soning would not naturally result from that particular kind of employment and that the hazard from it in that employment was not beyond that incident to employment in general would be proper. The fact that there were no known cases of lead poisoning among [employees] in other factories of the defendant where the same kind of work was being carried on as in that [particular factory] would be *relevant and material*."[3] (Emphasis added.) *Glodenis* v. *American Brass Co.*, supra, 118 Conn. 41. The same can be said of the absence of employment-related HIV infection among correction officers who are members of emergency response units; the lack of reported cases is indeed "relevant and material." Therefore, in assessing whether an increased likelihood of contraction exists among said correction officers, the dearth of HIV infection among them must be taken into account.

Accordingly, I respectfully dissent.

---

[3] I am mindful of our subsequent decision in *LeLenko* v. *Wilson H. Lee Co.*, supra, 128 Conn. 504, in which this court rejected a claim that a disease must be one that is "usual or generally recognized . . . ." This conclusion, however, does not mean that relevant statistics concerning a disease's prevalence within a given occupation cannot be considered. Rather, *LeLenko* merely indicates that prevalence alone is not dispositive of the issue. Prevalence certainly is indicative of an increased likelihood of contraction and should be considered as evidence of such.