RONALD C. CHAPPELL *v.* PFIZER, INC., ET AL.
(AC 29442)

DiPentima, Robinson and West, Js.

Argued March 17—officially released July 21, 2009

*Erik S. Bartlett,* with whom, on the brief, was *David C. Davis,* for the appellant (named defendant).

*Matthew Shafner,* with whom, on the brief, was *Carolyn P. Kelly,* for the appellee (plaintiff).

*Opinion*

WEST, J. In this workers' compensation appeal, we confront the definitional limitations of the term "occupational disease" as set forth in General Statutes § 31-275 (15). The sole issue on appeal is whether the workers' compensation review board (board) properly affirmed the determination of the workers' compensation commissioner for the second district (commissioner) that asthma is an occupational disease for the plaintiff, Ronald C. Chappell, a former chemical operator in the fermentation department of the defendant Pfizer, Inc.,[1] and, therefore, the plaintiff's notice of claim was timely filed under General Statutes § 31-294c. See *Discuillo* v. *Stone & Webster*, 242 Conn. 570, 577, 698 A.2d 873 (1997) (filing timely notice of claim condition precedent to liability and jurisdictional requirement that cannot be waived). We conclude that asthma is an occupational disease for the plaintiff, and, therefore, his notice of claim was timely filed. Accordingly, we affirm the decision of the board.

The following facts and procedural history are relevant to our disposition of the defendant's appeal. The plaintiff started his employment as a chemical operator in the defendant's fermentation department of its New London facility in 1966. He continued to work there as a chemical operator until 1981, when he was transferred to the defendant's carpentry department and, subsequently, to the mechanics' shop, where he worked until his retirement in 1992. His duties as a chemical operator involved all aspects of the fermentation process—the creation of organic molds—required for the defendant to manufacture antibiotics such as penicillin, streptomycin and terramycin. One of his duties was to place,

---

[1] Wausau Insurance Company, the insurance carrier for Pfizer, Inc., also was named as a defendant. For simplicity, we refer in this opinion to Pfizer, Inc., as the defendant.

by hand, in sterile tanks, the raw materials that comprised the finished antibiotics. Those materials included, inter alia, flour, sugar, a proprietary substance known as "815," blood meal and ground up chicken parts. After a period of time, those mixtures were piped into larger tanks as part of the fermentation process. After laboratory testing, other substances were added to the tanks, and the materials were cooked as part of the manufacturing procedure creating organic molds from which the antibiotics were produced. Eventually, the mixture was piped into yet another series of tanks in another building for further processing. The plaintiff also was required to clean the fermentation tanks of the waste and residue of the fermentation process once the materials had been piped out of them. During that procedure, the plaintiff was positioned atop the tanks, near the hatch. The cleaning procedure often involved the introduction of hot water into the tank and resulted in a vapor forming in the tank that contained the waste and residue of the fermentation process. Air was then pumped into the tank to clear the vapor, which vented out of the hatch at the top of the tank, exposing the plaintiff to those fumes. Another cleaning process required a tank to be sealed and the introduction of steam for a period of time. The resulting fumes were vented through the hatch at the top of the tank, again exposing the plaintiff to the airborne waste and residue of the fermentation process. The plaintiff did not wear protective respiratory gear during the cleaning procedure, nor was he required to do so by the defendant.

The plaintiff started having trouble breathing in 1978 and, as a result, was evaluated by a physician, who recommended that he give up smoking. The plaintiff continued to have breathing problems and saw various physicians and received various diagnoses and treatment protocols during the ensuing years.[2] Nevertheless,

---

[2] The board summarized the plaintiff's undisputed medical history leading to the diagnoses in 2002 of the asthma that is subject to this appeal as

it was not until January 31, 2002, that the plaintiff specifically was diagnosed with asthma by Robert Keltner, a pulmonologist. On June 28, 2002, the plaintiff filed a notice of claim asserting that he had suffered a compensable injury. On July 19, 2002, the defendant timely contested liability. On October 20, 2005, at the request of the defendant, the plaintiff was examined by Michael M. Conway, a pulmonologist. On June 1, 2006, the commissioner held a formal hearing at which the plaintiff testified. The commissioner also considered Conway's deposition testimony, which was submitted as an exhibit by the defendant. In his September 28, 2006 finding and award, the commissioner found that the plaintiff suffered from a compensable condition of occupational asthma. On October 10, 2006, the defendant filed a petition for review by the board of the

follows: "In 1981, the [plaintiff] suffered his first pneumothorax, the cause of which the [plaintiff] testified was hereditary as a result of his height, which is also known as '[t]all man's disease.' In 1982, 1983, 1984, 1988 and 1989, the [plaintiff] was examined as part of a routine health monitoring program by the [defendant], which did not reveal any pulmonary conditions. In 1985, the [plaintiff] had a recurrent right side pneumothorax resulting in surgery, and in 1986 the [plaintiff] had a chest X ray which was read as indicative of underlying emphysema. An X ray taken on October 24, 1988, was read as [chronic obstructive pulmonary disease (COPD)] pleural and parenchymal scarring right base.

"On August 29, 1990, the [plaintiff] was evaluated by Dr. [Michael S.] Urbanetti, a pulmonary doctor, who suspected irritable airways disease with superimposed 'dry' bronchitis and unknown effects of prior history of asbestos exposure, and was put on a trial of inhaled bronchodilators. In 1989, the [plaintiff] participated in a Lawrence and Memorial Yale University Cancer prevention study, which indicated a history of emphysema and paroxysmal tachycardia as well as potential evidence of asbestosis. In 1995, the [plaintiff] was admitted to Yale-New Haven Hospital with pulmonary problems. Their records reference a diagnosis of COPD, and testing revealed possible tuberculosis with an impression of right upper lobe collapse, bilateral fibronodular lesions and asymmetric pleural thickening.

"In 1997, the [plaintiff] was seen by Dr. Urbanetti with the impression of obstructive airways disease with persistent bronchitis. He diagnosed the [plaintiff] in 1998 with obstructive airways disease with environmental exacerbation. The [plaintiff] was treated by Dr. Urbanetti for obstructive airways disease until 2001."

commissioner's finding and award.[3] In its November 19, 2007 opinion, the board affirmed the decision of the commissioner. This appeal timely followed.

On appeal, the defendant concedes that the plaintiff's asthma is a compensable injury that arose out of and in the course of his employment in its fermentation department. The defendant, however, asserts that the board improperly affirmed the commissioner's conclusion that the plaintiff's asthma constituted an occupational disease under § 31-275 (15), and, therefore, the plaintiff should not be afforded the extended three years to file a notice of claim under § 31-294c (a).[4] We disagree.

Preliminarily, we set forth the relevant law and the standard of review applicable to this workers' compensation appeal. "The workers' compensation scheme explicitly provides for three categories of compensable injury: (1) accidental injury; (2) repetitive trauma injury; and (3) occupational disease. . . . The mere fact that an injury is of a type that is compensable, however, does not of itself mean that the commissioner properly may consider a claim based on that injury. The notice and filing prerequisites of § 31-294, which are jurisdictional . . . must also be satisfied." (Citations omitted.) *Discuillo* v. *Stone & Webster*, supra, 242 Conn. 574–75. Moreover, because "[f]iling a notice of claim or . . . satisfaction of one of the . . . exceptions [contained in § 31-294c (c)] is a prerequisite that conditions

[3] The defendant also filed a motion to correct with the commissioner on November 22, 2006, which was denied on November 27, 2006, and is not part of the present appeal.

[4] General Statutes § 31-294c (a) provides in relevant part: "No proceedings for compensation under the provisions of this chapter shall be maintained unless a written notice of claim for compensation is given within one year from the date of the accident or *within three years from the first manifestation of a symptom of the occupational disease*, as the case may be . . . ." (Emphasis added.)

whether the commission[er] has subject matter jurisdiction under the [Workers' Compensation] [A]ct . . . [and a] determination regarding . . . subject matter jurisdiction is a question of law, our review is plenary." (Citations omitted; internal quotation marks omitted.) *Estate of Doe* v. *Dept. of Correction*, 268 Conn. 753, 757, 848 A.2d 378 (2004).

"Section 31-275 (15) defines occupational disease as any disease peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such, and includes any disease due to or attributable to exposure to or contact with any radioactive material by an employee in the course of his employment. In interpreting the phrase occupational disease, we have stated that the requirement that the disease be peculiar to the occupation and in excess of the ordinary hazards of employment, refers to those diseases in which there is a causal connection between the duties of the employment and the disease contracted by the employee. In other words, [the disease] need not be unique to the occupation of the employee or to the work place; it need merely be so distinctively associated with the employee's occupation that there is a direct causal connection between the duties of the employment and the disease contracted. . . . Thus, an occupational disease does not include a disease which results from the peculiar conditions surrounding the employment of the claimant in a kind of work which would not from its nature be more likely to cause it than would other kinds of employment carried on under the same conditions." (Citations omitted; internal quotation marks omitted.) Id., 757–58.

In support of its claim, the defendant first argues, essentially, that the requirement of § 31-275 (15) that an occupational disease be peculiar to the employee's occupation and due to causes in excess of the ordinary

hazards of employment is a "cumulative test [in that] both restrictive tests must be met." The defendant argues that "[i]t is clear, that the statutory language [of § 31-275 (15)] and the Supreme Court's interpretation [of it] require [the plaintiff] to show not only that the disease was proximately caused by the employment and arose out of and in the [course] of the employment, but in addition that such disease was due to an increased risk from that type of employment." Our Supreme Court adjudicated this very assertion in *Estate of Doe* v. *Dept. of Correction*, supra, 268 Conn. 753, and concluded that it was contrary to its precedents.[5] See id., 759 n.6 (citing cases in which Supreme Court applied and reaffirmed language and law relied on in *Estate of Doe*). There, the court concluded that in determining whether a disease is peculiar to and distinctively associated with an occupation, the more inclusive test that there must be a direct causal connection between the duties of the employment and the disease contracted

---

[5] In *Estate of Doe*, the majority concluded that for correctional officers who were members of the correctional emergency response unit, human immunodeficiency virus (HIV) was an occupational disease under § 31-275 (15) because it was "peculiar to and so distinctively associated with the [correctional officers'] occupation that there [was] a direct causal connection between the duties of the employment and the disease contracted." (Internal quotation marks omitted.) *Estate of Doe* v. *Dept. of Correction*, supra, 268 Conn. 758. The dissent in *Estate of Doe* stated that the majority's analysis improperly "focus[ed] on [Supreme Court] case law emphasizing causation [and] collapse[d] what [had] been a two part analysis into a single inquiry into causation and fail[ed] to explore adequately whether [the employees in question were] at an increased risk of contracting HIV." Id., 778 (*Vertefeuille, J.*, dissenting).

This approach closely mirrors the defendant's on appeal. The majority in *Estate of Doe*, however, concluded that this approach improperly focuses on the prevalence of a disease rather than the causal connection between the duties of employment and the disease. Furthermore, this approach, the majority concluded, was rejected in *LeLenko* v. *Wilson H. Lee Co.*, 128 Conn. 499, 505, 24 A.2d 253 (1942), and *Hansen* v. *Gordon*, 221 Conn. 29, 38, 602 A.2d 560 (1992). See *Estate of Doe* v. *Dept. of Correction*, supra, 268 Conn. 765 n.10; see also *Hansen* v. *Gordon*, supra, 36 (noting that board construes statutory definition of occupational disease simply to refer to concepts of proximate causation).

was consistent with its prior decisions on occupational diseases as well as the national trend.[6] See id., 763–65. Therefore, the defendant's argument that the plaintiff, in addition to showing that his asthma was proximately caused by his employment with the defendant as a chemical operator, must also show that that employment incorporated an increased risk for asthma fails.

Next, the defendant contends that although the plaintiff's asthma was caused by his exposure to airborne organic materials during his employment as a chemical operator in its fermentation department, as the defendant concedes, he has failed to adduce evidence that "asthma is distinctively associated and peculiar to that type of employment." The defendant asserts, therefore, that the plaintiff's injury constitutes a repetitive trauma and, as a result, is not subject to the three year limitation for filing a notice of claim. See *Malchik* v. *Division of Criminal Justice*, 266 Conn. 728, 744, 835 A.2d 940 (2003) (claims of injuries resulting from repetitive trauma subject to same one year limitation period as claims for accidental injuries). The plaintiff asserts that the record fully supports the commissioner's finding that his asthma is both peculiar to his occupation as a chemical operator in the defendant's fermentation

---

[6] " 'All states now provide general compensation coverage for occupational diseases. For the purpose of defining the affirmative inclusion of disease within this term, the older definition distinguishing occupational disease from accident has been largely abandoned, with its stress on gradualness and on prevalence of the disease in the particular industry. Jurisdictions having general coverage of occupational disease now usually define the term to include any disease arising out of exposure to harmful conditions of the employment, when those conditions are present in a peculiar or increased degree by comparison with employment generally. Thus, even a disease which is rare and which is due to the claimant's individual allergy or weakness combining with employment conditions will usually be held to be an occupational disease if the increased exposure occasioned by employment in fact brought about the disease.' 3 A. Larson & L. Larson, Workers' Compensation Law (1999) c. 52, scope, p. 52-1." *Estate of Doe* v. *Dept. of Correction*, supra, 268 Conn. 764–65.

department and is due to causes in excess of the ordinary hazards of employment as such.

Here, we agree with the plaintiff that his asthma is peculiar to and so distinctively associated with his occupation that there is a direct causal connection between the duties of the employment and the disease contracted. See *Hansen* v. *Gordon*, 221 Conn. 29, 35, 602 A.2d 560 (1992). The defendant purports that "common sense tells us that mixing organic substances is no more likely to cause asthma than any other type of employment involving airborne irritants" and that, therefore, the plaintiff's asthma is not an occupational disease. Our review of the record clearly indicates that this claim has no merit. Conway, at the request of the defendant, examined the plaintiff as well as his voluminous medical records. On the basis of his findings, Conway diagnosed the plaintiff with occupational asthma, created a report for the defendant and testified by deposition.[7] In his report to the defendant, Conway specifically diagnosed the plaintiff's primary respiratory illness as "occupational mold exposure induced asthma," a form of organic antigen induced asthma. Conway explained in his deposition that this type of asthma arises after repeated exposure to organic airborne antigens and results in "the body . . . develop[ing] increasing levels of reactivity to that exposure [so much so] that the symptoms start to occur." Conway further testified that the symptoms of asthma "started soon after [the plaintiff] began working at the fermentation areas at Pfizer and later progressed." He specifically identified "all of the exposures to the fermentation tanks" as the point in time when the plaintiff became symptomatic. Conway also testified that the "sensitization period" before symptoms become prevalent can take from one or two

---

[7] Both the report and Conway's testimony were full exhibits before the commissioner.

weeks to several years and fit the plaintiff's symptomology. Conway concluded that the plaintiff's asthma was a result of his exposure to airborne organic substances in and around the defendant's fermentation tanks, testifying that "without the exposure to the fermentation tank, I felt that the asthma would not have occurred . . . ."[8] Moreover, Conway testified that critical to his conclusion that the plaintiff's asthma was occupationally related was the plaintiff's exposure to *organic* materials prevalent in his occupation as a chemical operator. He went on to explain that although the inflammatory response to an individual's airways varies when exposed to organic substances, in some people such exposure often leads to asthma, as it had in the plaintiff.

The defendant further argues that there is nothing in the record to support a finding that the plaintiff's asthma was peculiar to his occupation as a chemical operator but, rather, that the record only supports a finding that his occupation *itself* was peculiar because it involved the mixing and fermenting of organic substances like blood meal and ground up chicken parts. Again, we disagree. The plaintiff testified that while employed as a chemical operator by the defendant, he was exposed not only to the raw organic materials used by the defendant in the manufacture of antibiotics, but also to the vaporized waste and residue of the fermentation process. He also testified that his exposure was an integral part of his duties as a chemical operator. In the course of his fifteen years of employment as a chemical operator, the plaintiff regularly was exposed to airborne organic antigens, including blood meal, ground up chicken parts, substance "815" and the vaporized waste and residue of the organic molds produced from the fermentation process. There is no dispute that his exposure arose out of and in the course of his duties as a

---

[8] Conway stated in his report to the defendant that despite the plaintiff's cigarette smoking playing a factor in his illness, but for the plaintiff's exposure to the fermentation tanks, his "airway disease would be far less significant."

chemical operator or that it directly led to his asthma. Moreover, the specific duties of the plaintiff's job as a chemical operator—handling the raw organic materials and cleaning fermentation tanks of the waste and residue of organic molds—actually increased his exposure to the airborne substances that caused his asthma. Those duties of the plaintiff's employment are not common occurrences in most of the working world and are so distinctively associated with the plaintiff's occupation that there is a direct causal connection between the duties of the employment and the disease contracted. See *Estate of Doe* v. *Dept. of Correction,* supra, 268 Conn. 763.

Additionally, the plaintiff's asthma constitutes an occupational disease because his employment as a chemical operator in the defendant's fermentation department was more likely to cause this disease than would other kinds of employment under the same conditions. See id. The duties of a chemical operator required participation in employment activities that increased the plaintiff's risk of exposure to airborne organic substances. Other occupations conducted within the defendant's manufacturing facility, the record reflects, did not have the same level of risk due to different duties of employment.[9] A carpenter, for example, although working with a chemical operator

---

[9] The plaintiff, for several years after he left the fermentation department, was a carpenter for the defendant and worked in the mechanics' shop as well. He testified that although he often worked in the same area as he had as a chemical operator, he was not exposed to airborne organic antigens in either of these subsequent occupations. This was in part due to the fact that when work was required inside a fermentation tank, for example, to repair the tank, it was cleaned of the waste and residue of fermentation prior to his entering. It also was due to the fact that the plaintiff was required to wear protective respiratory gear while working in areas as a carpenter and as a mechanic where he could be exposed to airborne irritants. Also, the carpenters' shop was fully ventilated with each piece of machinery "pulled out with positive pressure so that [sawdust and other debris] went into a large holding tank."

in the same facility, did not face the same level or risk of exposure because of differing duties of employment. Although both were present during the manufacture of antibiotics, as the record reveals, the carpenter's duties of employment ostensibly did not require the level of exposure to organic airborne materials because his or her duties did not include direct contact with those materials during the fermentation process. The plaintiff's duties of employment, however, distinctly required direct and intimate contact with both the raw materials and the vaporized waste and residue of the fermentation process, including organic molds. Therefore, in the present case, the plaintiff's asthma constitutes an occupational disease because his employment as a chemical operator in the defendant's fermentation department was more likely to cause this disease "than would other kinds of employment carried on under the same conditions." Id. Accordingly, we conclude that the board properly affirmed the commissioner's determination that the plaintiff's asthma was an occupational disease.

The decision of the workers' compensation review board is affirmed.

In this opinion the other judges concurred.